# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ASHLEY BOYLE, on her own behalf, and on behalf of JOHN DOE, her minor child, | : : : | |
| Plaintiffs, | : : | |
| v. | : : : | CIVIL ACTION No. 19-3270 |
| ROBERT EVANCHICK, ET AL., | : : | |
| Defendants. | : | |

**McHUGH, J.**                                                                                                     **MARCH 19, 2020**

## MEMORANDUM

      This civil rights action arises out of an altercation between two students at a grade school. Only one of the students engaged in violent acts, but both were prosecuted, with the victim of the assault accused of the summary offense of disorderly conduct for uttering racial epithets that purportedly provoked the attack. The charge was dismissed at trial by the judge presiding over the case, and the mother of the child now brings a variety of claims.

      Specifically, Plaintiff Ashley Boyle brings claims under 42 U.S.C. § 1983 for malicious prosecution; failure to abide by the requirements of *Brady v. Maryland* regarding the production of exculpatory evidence; suppression of and retaliation against free speech in violation of the First Amendment; and separate state law claims for malicious prosecution, intentional infliction of emotional distress, and negligence. Defendants respond by invoking a combination of absolute, qualified, and sovereign immunity defenses.

      The injuries suffered by Ms. Boyle's son are deeply regrettable, and I harbor significant doubts regarding the wisdom of criminally charging the victim of a serious attack, especially when video evidence demonstrates he did not act aggressively at any point. Nevertheless,

Plaintiffs' claims must fail. Their attempt to assert federal malicious prosecution claims under the Fourteenth Amendment, but they must be properly analyzed under the Fourth Amendment, and Doe cannot be said to have been "seized" as required by the controlling standard. Doe also cannot show the prejudice required to establish a *Brady* violation. Plaintiffs' First Amendment claims are defeated by the existence of probable cause, or in the alternative, qualified immunity. Finally, Plaintiffs' intentional infliction of emotional distress and negligence claims are governed by state law, and as pled they are barred by sovereign immunity. Accordingly, I am compelled to grant Defendants' Motion to Dismiss.[1]

## I. Relevant Background

John Doe is a white 12-year old child who attends school in Chester County, PA. Am. Compl. ¶ 2, ECF 6; Def. Mot. to Dismiss, at 4, ECF 10-1. On December 7, 2018, Doe was lining up for lunch at school when he and a group of other students had a confrontation. Am. Compl. ¶ 18. There is video of the altercation which all parties have been able to review by now, but it does not contain audio. *Id.* Doe can be seen talking with the group, including his "Assailant" (who is black).[2] The verbal confrontation escalated into a physical fight, with one student shoving Doe and then Assailant punching Doe multiple times in the face. *Id.* ¶ 19; Def. Mot. to Dismiss, at 3. Doe suffered serious injuries as a result, including a broken nose and a concussion. Am. Compl. ¶ 21.

The school's dean of students (Dean) investigated the incident and found that Doe and Assailant had exchanged abusive language with one another. Def. Ex. B., ECF 11.[3]

---

[1] Because Plaintiffs' claims cannot succeed with respect to any of the Defendants, I need not consider whether all of them are proper parties to the suit.

[2] The identities of both the minor plaintiff and his assailant are protected by pseudonyms.

[3] At the motion to dismiss stage, a court may properly consider a "document *integral to or explicitly relied* upon in the complaint" provided by the defendant without converting the motion into a motion for summary judgment. *In re*

2

Specifically, Assailant admitted that he called Doe a "gay asshole," while Doe admitted he had called Assailant a "lip fuller poster child" and a "prick." *Id.* There was a dispute as to whether Doe called Assailant a "n****r"; four students interviewed by the Dean claimed to have heard him utter the slur, and four other students claimed not to have heard it. *Id.*

After reviewing the investigative summary contained in the Dean's Report and the video, Pennsylvania State Police Trooper Ryan R. McKeon, in consultation with supervisor Cpl. Robert S. Kirby, charged Doe with a summary offense of disorderly conduct under 18 Pa. C.S. § 5503(a)(4). Am. Compl. ¶ 22. This review by the State Police did not occur until well after the event. Doe has not alleged that he was arrested or detained pursuant to the charge. In the summons issued to Doe, Trooper McKeon wrote that "the def[endant] did express profane language and insults that were offensive to the victim." *Id.* Doe pleaded not guilty to the charge, and retained the same counsel representing him in this action to defend him against the summary charge. *Id.* ¶¶ 22, 25. Counsel contacted Kirby to request the production of exculpatory materials pursuant to *Brady* and Pennsylvania Rule of Criminal Procedure 573, including the video of the altercation, but Kirby did not provide counsel with any such materials. *Id.* ¶¶ 26-28.

Doe's criminal trial was held on March 5, 2019. *Id.* ¶ 34. While Trooper McKeon was being cross-examined by counsel, the presiding judge *sua sponte* entered a ruling of "not guilty" for Doe. *Id.* ¶¶ 47-49. Plaintiffs now sue for malicious prosecution, alleging that a violation of 18 Pa. C.S. § 5503(a)(4) "***requires*** actions, not words," and that State Police Defendants engage

---

*Burlington Coat Factory Securities Litigation*, 114 F.3d 1410, 1426 (3d Cir. 1997) (citation omitted). This exception recognizes that "the primary problem raised by looking to documents outside the complaint—lack of notice to the plaintiff' loses force where "'plaintiff has actual notice . . . and has relied upon these documents in framing the complaint.'" *Id.* (quoting *Watterson v. Page*, 987 F.2d 1, 3-4 (1st Cir. 1993)). While the Complaint does not explicitly rely upon it, the Complaint makes multiple references to the Dean's Report in discussing Defendant McKeon's conduct prior to and at Doe's criminal trial. *See* Am. Compl. ¶¶ 38-47. For this reason, I will invoke the exception here and consider the Dean's Report without converting this Motion into a motion for summary judgment.

in "a custom, pattern, practice and/or policy of failing to train State Police troopers about the proper use of the disorderly conduct statute," as exemplified by Doe's prosecution for public profanity. *Id*. ¶¶ 61-62 (emphasis in original). Moreover, Plaintiffs contend that Defendants have disregarded two settlement agreements in which they agreed to discontinue the practice of charging defendants with violation of 18 Pa. C.S. § 5503 for the use of profane language. *Id*. ¶¶ 65-67. Defendants disagree with Plaintiffs' characterization of how 18 Pa. C.S. § 5503 can be enforced, arguing that words alone may at times be enough to give rise to a violation.

## II.     Standard of Review

In this Circuit, motions to dismiss under Federal Rule of Civil Procedure 12(b)(6) are governed by the well-established standard set forth in *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).

## III.    Discussion

### A. Plaintiffs cannot show that Doe has been "seized" as required to plead malicious prosecution pursuant to 42 U.S.C. § 1983

#### 1. The malicious prosecution claim must be analyzed under the Fourth Amendment

Under the Third Circuit's standard for successfully pursuing a Section 1983 action for malicious prosecution, a plaintiff must show: (1) the defendants initiated a criminal proceeding; (2) the criminal proceeding ended in the plaintiff's favor; (3) the proceeding was initiated without probable cause; (4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered a deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding. *Estate of Smith v. Marasco*, 318 F.3d 497, 521 (3d Cir. 2003). Recognizing the obstacle presented by the fifth required element of Doe's claim, deprivation of liberty, Plaintiffs seek to proceed under the Fourteenth Amendment Due Process Clause instead. They principally rely upon Justice Kennedy's concurring opinion in

4

*Albright v. Oliver*, 510 U.S. 266 (1994), in doing so. In *Albright*, the plaintiff was the subject of an arrest warrant. Upon learning of it, he surrendered and was released on bail. The charges were then dismissed. The accused then brought a Fourteenth Amendment claim asserting a liberty interest to be free from prosecution except for probable cause.[4]

The Court denied relief, without a majority opinion.[5] In his concurrence, Justice Kennedy assumed "for the purposes of this case" that freedom from malicious prosecution is protected by the Due Process Clause, *Albright*, 510 U.S. at 286 (Kennedy, J., concurring), but further concluded that because Mr. Albright could have pursued a post-deprivation remedy for malicious prosecution under Illinois state law, he would be foreclosed from bringing a corresponding § 1983 action. *Id*. Plaintiffs attach great significance to this language, arguing that because Pennsylvania does not provide a post-deprivation remedy for the tort of malicious prosecution, Doe is therefore entitled to bring a claim under the Fourteenth Amendment without an arrest or seizure having taken place. As an initial matter, I am not persuaded that Justice Kennedy intended this language to carry the substantive import that Plaintiffs seek to attach to it. Rather, in my view, he was simply narrowing the scope of the issue before him.

To interpret this language as Plaintiffs propose would mean that a new constitutional cause of action is born whenever a state law remedy is lacking. Such a principle would make no sense. Furthermore, the Third Circuit had occasion to consider *Albright*, and has interpreted it to mean that plaintiffs pursuing malicious prosecution claims under § 1983 must demonstrate that they have been wrongfully subjected to a Fourth Amendment seizure. Specifically, it has held

---

[4] Presumably, the plaintiff in *Albright* couched his claim in Fourteenth Amendment terms because there was no loss of liberty, an essential element of a Fourth Amendment claim.

[5] Justice Rehnquist wrote a four-person plurality opinion in *Albright*, with Justices Kennedy, Ginsburg, and Souter writing separate concurrences. The splintered decision did not completely settle the law regarding malicious prosecution claims under § 1983.

that "the constitutional violation is the *deprivation of liberty accompanying* the prosecution," and thus "a plaintiff asserting a malicious prosecution claim must show some deprivation of liberty consistent with the concept of 'seizure.'" *Gallo v. City of Philadelphia*, 161 F.3d 217, 222 (3d Cir. 1998) (citations omitted) (emphasis added). Consequently, "prosecution without probable cause is not, in and of itself, a constitutional tort." *Id.* In support of this reading of *Albright*, the Third Circuit took note of Justice Stevens's robust dissent arguing that initiating a prosecution without probable cause should give rise to a Fourteenth Amendment due process violation. That dissent was even more supportive of Plaintiffs' argument than Justice Kennedy's analysis. *Gallo*, 161 F.3d at 222 n.5. In short, the Third Circuit was fully aware of both Justice Kennedy's concurrence and Justice Stevens's dissent in *Albright* when it decided *Gallo* and did not adopt the model Plaintiffs advance here. Thus, *Gallo* controls, and reaffirms the Fourth Amendment standard.[6]

### 2. *Doe has not experienced Fourth Amendment "seizure"*

Under the controlling Fourth Amendment standard, Plaintiffs cannot establish that a seizure occurred. A seizure is "a show of authority that restrains the liberty of a citizen" or "government termination of freedom of movement intentionally applied." *Gallo*, 161 F.3d at 223 (citations omitted). In supplying content for these definitions, the Third Circuit tracked the reasoning of Justice Ginsburg's concurrence in *Albright*, which views seizure as continuing from

---

[6] Neither Plaintiffs nor Defendants cite *Torres v. McLaughlin*, 163 F.3d 169 (3d Cir. 1998), decided a few weeks after *Gallo*. On its face, *Torres* would appear to lend the strongest legal basis for Plaintiffs' Fourteenth Amendment claim, as the Court there interpreted *Albright* to mean that "a section 1983 claim may be based on a constitutional provision other than the Fourth Amendment," as long as those claims are "governed by explicit constitutional text" and "not grounded in substantive due process." *Id*. at 172. But the parties might have omitted citing *Torres* because a later decision largely discounted it. In *Schneyder v. Smith*, 653 F.3d 313 (3d Cir. 2011), the Third Circuit explicitly recognized the conceptual tension between the approaches taken in *Gallo* and *Torres* and endorsed *Gallo*. It characterized the relevant language in *Torres* as "dicta" and held that the fact that it was decided after *Gallo* "leav[es] its precedential value" in jeopardy. *Id*. at 321. (The majority opinion in *Torres* does not cite to *Gallo*, but the dissent did.)

6

the moment of initial physical custody to non-physical restraints imposed upon defendants to secure their subsequent appearances in court. *Albright*, 510 U.S. at 278 (Ginsburg, J., concurring) ("The common law thus seems to have regarded the difference between pretrial incarceration and other ways to secure a defendant's court attendance as a distinction between methods of retaining control over a defendant's person, not one between seizure and its opposite"). The Third Circuit has therefore found that the combination of travel restrictions, posting bond, attending court hearings, and regularly reporting to Pretrial Services gives rise to seizure. *Gallo*, 161 F.3d at 222; *see also Schneyder*, 653 F.3d at 320 ("[T]he difference between detention in jail, release on bond, and release subject to compliance with other conditions is in the *degree* of restriction on the individual's liberty, not in the *kind* of restriction") (citations omitted).

But the Third Circuit has further held that the compulsion to attend hearings alone does not constitute seizure. *DiBella v. Borough of Beachwood*, 407 F.3d 599, 603 (3d Cir. 2005). In *DiBella*, the plaintiffs were never arrested, did not have to post bail, incurred no travel restrictions, and did not have to keep contact with Pretrial Services. On those facts, the Court held they did not experience a Fourth Amendment seizure, notwithstanding the requirement of their attendance at trial, with the result that they "failed to state a cause of action for malicious prosecution" under § 1983. *Id*. The facts here much more closely mirror *DiBella* than *Gallo*. Doe was issued a summons but has not otherwise pled that he suffered any additional pretrial restriction. Like the plaintiffs in *DiBella*, Doe was only compelled to attend his criminal hearing, and so did not experience a Fourth Amendment seizure. Because seizure is a necessary element of malicious prosecution under § 1983, Plaintiffs' claim fails.

**B. Plaintiffs' due process claim under *Brady v. Maryland* claim fails because they cannot establish prejudice**

In *Brady v. Maryland*, 373 U.S. 83, 86 (1963), the Supreme Court held that failure on the part of the prosecution to disclose exculpatory evidence violates the Due Process Clause of the Fourteenth Amendment. The Third Circuit has recognized a civil cause of action under § 1983 for failure to disclose evidence. To prevail, the plaintiff must first show that the prosecution had an obligation to disclose the evidence in question, "i.e. whether the evidence is *Brady* material." *Smith v. Holtz*, 210 F.3d 186, 196 (3d Cir. 2000). Second, the plaintiff must separately demonstrate that the "suppression of that evidence undermines confidence in the outcome of a criminal trial." *Id.* Specifically, "[p]rejudice must have ensued" from the State's failure to produce the evidence, *id.* (quoting *Strickler v. Greene*, 527 U.S. 263, 282 (1999)), requiring the plaintiff to prove "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different," *id.* at 197 (quoting *United States v. Bagley*, 473 U.S. 667, 678 (1985)).

In *Smith*, the plaintiff was convicted. The conviction was then set aside for prosecutorial misconduct, and retrial barred on grounds of double jeopardy. Plaintiff Doe here was acquitted. The question then arises: Can the accused in a criminal case ever successfully sue for a *Brady* violation following acquittal? The Commonwealth cites a *per curiam* non-precedential decision from the Third Circuit in support of its contention that a criminal defendant who is acquitted can never succeed in a subsequent civil rights action because of the absence of prejudice. *Telzer v. Borough of Englewood Cliffs*, 783 Fed. App'x. 253, 258 (3d Cir. 2019). In the absence of binding precedent from the Court of Appeals, I am reluctant to endorse such a blanket rule because prejudice depends on the facts of each case. For example, a line prosecutor might hide exculpatory evidence which, when later discovered by a supervisor, could result in the dismissal

of charges. Similarly, if one prosecutor assumes responsibility for a file from another, and remedies an earlier failure to comply with *Brady*, depending upon the egregiousness of the offense, a court might consider dismissal as a sanction. Meanwhile, as the case is pending, there are myriad ways a defendant can suffer prejudice: unwarranted pretrial detention; public stigmatization due to being charged; loss of income due to needing to hire counsel and take time off work; and the anxiety of possible conviction. In my view, therefore, a case-by-case analysis of prejudice represents a more sensitive approach to *Brady* violations asserted under § 1983 when a defendant is acquitted.

Assuming then that even an acquitted criminal defendant might be able to succeed on a *Brady* claim under § 1983, Plaintiffs here cannot establish that failure to produce the withheld materials led to Doe having endured prejudice. As an initial matter, the presiding trial judge, acting *sua sponte*, dismissed the charge against Doe. Necessarily, therefore, failure to produce the evidence cannot be said to have affected the outcome at trial.

The remaining question then is whether the trial could have been averted had the evidence been produced. As a preliminary matter, I will assume that the video of the altercation and the school's report of witness interviews would qualify as *Brady* material. Nevertheless, production of these materials would not have resulted in any dismissal of the charges before trial. The video confirms that Doe did not engage in any physical violence, but the charge against him was not based on acts of aggression but rather upon his use of provocative words, and there was no audio to capture the words that were spoken. As to the Dean's Report, although four students exculpated him from using one particular racial epithet, four others inculpated him. The investigating trooper's supervisor approved the charges being brought based upon the material Plaintiffs contend should have been produced. In short, there is nothing in what was withheld

that would have prevented the case from proceeding to a hearing, where Doe was then acquitted. Given these facts, Doe cannot be said to have suffered any prejudice.

### C. Plaintiffs' First Amendment claims fail due to the "fighting words" exception to First Amendment protection, or in the alternative, qualified immunity

*1. Doe's speech was unprotected under the "fighting words" doctrine, and chargeable under 18 Pa. C.S. § 5503*

The First Amendment protects individuals from incurring criminal or civil liability for engaging in protected speech. Plaintiffs argue in broad terms that Doe was necessarily punished for the content of his speech because the Pennsylvania disorderly conduct statute requires some form of conduct, and the video of the incident makes it indisputably clear that Doe did nothing other than engage in speech. There are, however, certain narrow categories of speech that are entitled to no protection, which "include the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace." *Chaplinsky v. State of New Hampshire*, 315 U.S. 568, 572 (1942). In *Chaplinsky*, a Jehovah's Witness verbally attacking organized religion in a public place was admonished by law enforcement not to incite a gathering crowd. When a town marshal returned a second time, Chaplinsky derided him as a "damned racketeer" and a "damned Fascist," resulting in his arrest. *Id.* at 569. The Supreme Court unanimously upheld his conviction on the basis that such speech had no purpose other than to injure or incite others.[7]

Applied broadly, the fighting words doctrine would have the capacity to dramatically impact First Amendment rights, precisely because it allows punishment of pure speech. In subsequent cases, the Supreme Court has resisted giving the doctrine broad application, leading

---

[7] Placed in historical context, use of the term "fascist" in 1940 must be assumed to likely have had far greater rhetorical impact than is the case today, when it seems to be invoked far more casually.

one critic of it to observe that "not once in the ensuing sixty-two years has the United States Supreme Court upheld a conviction based on it." Burton Caine, *The Trouble with "Fighting Words": Chaplinsky v. New Hampshire is a Threat to First Amendment Values and Should be Overruled*, 88 Marq. L. Rev. 441, 444 (2004). The Seventh Circuit has also observed that after *Chaplinsky* the Supreme Court never again relied upon the capacity of words alone to injure as the basis for a conviction:

> Although the "inflict-injury" alternative in Chaplinsky's definition of fighting words has never been expressly overruled, the Supreme Court has never held that the government may, consistent with the First Amendment, regulate or punish speech that causes emotional injury but does not have a tendency to provoke an immediate breach of the peace.

*Purtell v. Mason*, 527 F.3d 615, 624 (7th Cir. 2008). Indeed, soon after *Chaplinsky* the Supreme Court took pains to observe that speech "may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger," and thus is entitled to protection. *Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949). Accordingly, for words to be categorized as creating "an immediate breach of the peace," they must go beyond inducing generalized unrest, and represent "personally abusive epithets which, when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction." *Cohen v. California*, 403 U.S. 15, 20 (1974). The Supreme Court's retreat from the broad standard announced in *Chaplinsky* has led another First Amendment scholar to conclude that there currently exists a "strong body of law expressly limiting the fighting words doctrine to face-to-face confrontations likely to provoke immediate violence." Rodney A. Smolla, *Words "Which By Their Very Utterance Inflict Injury": The Evolving Treatment of Inherently Dangerous Speech in Free Speech Law and Theory*, 36 Pepp. L. Rev. 317, 350 (2009).

11

The Third Circuit has explicitly acknowledged that the doctrine is "extremely narrow," with the result that unprotected fighting words "must do more than bother the listener; they must be nothing less than 'an invitation to exchange fisticuffs.'" *Johnson v. Campbell*, 332 F.3d 199, 212 (3d Cir. 2003) (quoting *Texas v. Johnson*, 491 U.S. 397, 408 (1989)). In *Johnson,* the Court concluded that a suspect's use of profanity toward an officer following an investigative stop did not create probable cause to arrest for disorderly conduct. Despite this substantial narrowing, the "fighting words" doctrine nonetheless remains viable. In *Gilles v. Davis*, 427 F.3d 197, 205 (3d Cir. 2005), the Third Circuit found that a campus police officer had qualified immunity for arresting a self-styled evangelist who was publicly denouncing the morals of college students. The officer took no action as the preacher broadly condemned the students as "drunkards" and "fornicators," but proceeded with an arrest after the speaker targeted a specific student as a "Christian lesbo," "lesbian for Jesus," one who would "lay down with dogs," and "a bestiality lover." *Id*. at 202. The Court of Appeals concluded that this direct verbal assault on an individual in the crowd could be considered an incitement to violence, if not from her, then onlookers. More specifically, the Court noted that because the student personally identified herself as both Christian and lesbian, the words were "abusive, akin to a racial slur." *Id*. at 206. Of note, the plaintiff in *Gilles* was prosecuted under the same statute at issue here, and like Doe, did not accompany his speech with any threatening conduct.

Given the facts here, it is significant that the Third Circuit analogized the anti-gay slurs in *Gilles* to a racial slur. Although Plaintiffs challenge whether the prosecuting trooper had evidence of Doe using racial epithets, the record makes clear that the Dean's Report formed part of the basis for the charge, and four of the students professed to have heard Doe use the term "n****r." That epithet has been aptly described as the "paradigmatic slur" toward African

Americans and the "most socially consequential insult." Randall Kennedy, *N\*\*\*\*r: The Strange Career of a Troublesome Word*, at 22, 35 (Pantheon Books, 2002). There can be no doubt that if the word was in fact uttered, it was directed by Doe to his Assailant, face-to-face, and its capacity to incite violence is borne out by the attack that followed.[8]

Many courts have recognized that the use of the word "n\*\*\*\*r," directed insultingly at an individual, falls within this category of "fighting words." In upholding the firing of a prosecutor who called a bar patron a "n\*\*\*\*r," the Supreme Court of North Carolina observed that "[n]o fact is more generally known than that a white man who calls a black man a 'n\*\*\*\*r' within his hearing will hurt and anger the black man and often provoke him to confront the white man and retaliate." *In re Spivey*, 480 S.E.2d. 693, 699 (N.C. 1997). Other state appellate courts have endorsed the logic of *Spivey*. *See, e.g.*, *State v. Hoshijo ex rel. White*, 76 P.3d 550, 565 (Haw. 2003) (holding appellant's use of "n\*\*\*\*r" produced likelihood of violence, rendering it a fighting word); *In re John M.*, 36 P.3d 772, 776 (Ariz. App. Ct. 2001) (appellant leaning out of a car window and yelling "fuck you, you god damn n\*\*\*\*r" uttered fighting words); *In re H.K.*, 778 N.W.2d 764, 770 (N.D. 2010) (finding juvenile's use of "n\*\*\*\*r," coupled with other intimidating behavior, supported disorderly conduct charge); *In re Shane EE.*, 48 A.D.3d 946, 946 (N.Y. App. Div. 2008) (similarly finding juvenile's statement "we shoot n\*\*\*\*rs like you in the woods" to another juvenile to constitute fighting words along with true threat of violence).[9]

It should be recognized that this case bears one significant distinction from *Gilles* and other "fighting words" cases. Here, the individual charged was not arrested in the midst of a

---

[8] *Lewis v. City of New Orleans*, 408 U.S. 913, 913 (1972) (Powell, J., concurring) (noting that fighting words are those "addressed by one citizen to another, face to face and in a hostile manner").

[9] As reprehensible as the term is, not every utterance constitutes fighting words. Epithets shouted from a distance will not suffice, *State v. Liebenguth*, 186 A.3d 39 (Conn. App. Ct. 2018), and law enforcement officers are presumed capable of exercising a higher degree of restraint than civilians, *City of Houston, Tex. v. Hill*, 482 U.S. 451, 462 (1987).

volatile situation where the officer had to make a pressured decision while confronting a crowd. Rather, the trooper who cited Doe had the ability to reflect calmly on events after the fact. That is some cause for concern. On balance, however, given the Third Circuit's analysis in *Gilles*, and the conclusions reached by other courts, I am persuaded that use of this epithet in a confrontational face-to-face encounter constitutes fighting words and is therefore unprotected speech.

Plaintiffs raise one final argument, namely, that when the Assailant himself stood trial, he professed not to have heard the epithet. How, Plaintiffs ask, could any speech on his part have been provocative if it was not heard by the individual to whom it was directed? The first answer to that inquiry is that fighting words can also incite others present, as recognized in *Gilles*. Second, Plaintiffs cite to no authority for the proposition that the fighting words doctrine applies only where there is specific reaction to use of the term. The existing test does not include any element of causation, as does a tort claim. When speech is deemed unprotected, it essentially represents a determination that the speech lacks social value. Its value, or lack thereof, is not dependent on the response of specific listeners.

> 2. *Alternatively, qualified immunity would apply because it was not "clearly established" law that charging Doe with disorderly conduct would violate his First Amendment rights*

Even if Doe's speech were entitled to First Amendment protection, Defendants have met their burden in asserting qualified immunity. "Qualified immunity shields government officials from personal liability for civil damages 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *George v. Rehiel*, 738 F.3d 562, 572 (3d Cir. 2013) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In order to overcome the defense of qualified immunity, a plaintiff must plead facts

demonstrating that the defendant's conduct (1) "violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *George*, 738 F.3d at 572 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)).

Plaintiffs argue that it is clearly established law that charging a defendant with disorderly conduct under 18 Pa. C.S. § 5503(a)(4) for their speech, without accompanying physical action, is a First Amendment violation. *Gilles* effectively disposes of that argument. Even assuming for the sake of argument that Plaintiffs' speech was protected, one can hardly say that such a right was clearly established. That requires "a robust 'consensus of cases of persuasive authority'" clearly establishing the right at issue in the circumstances of this case. *al–Kidd,* 563 U.S. at 742 (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999)). The consensus must be so clear that no reasonable officer could believe his conduct was lawful. *Kelly v. Borough of Carlisle*, 622 F.3d 248, 253 (3d Cir. 2010).[10] There is certainly no case from the Supreme Court or Third Circuit suggesting that use of this racial epithet is protected. Indeed, there have been criminal prosecutions for use of the word in Pennsylvania. *See, e.g.*, *Commonwealth v. Burns*, 2014 WL 10752216 (Pa. Super. Ct. Dec. 3, 2014).[11] Added to that is the case law from other jurisdictions explicitly holding that the epithet "n****r" falls within the category of fighting words. Doe's purported First Amendment right to employ this insult cannot be said to have been "clearly established" for the purposes of overcoming qualified immunity.[12]

---

[10] At argument, counsel protested that the standard for qualified immunity presents an insurmountable obstacle for many plaintiffs. I agree that there is substantial merit in many of the criticisms of the doctrine, *e.g.*, William Baude, *Is Qualified Immunity Unlawful?*, 106 Cal. L. Rev. 45 (2018), but it remains the controlling legal standard.

[11] *Burns* is a non-precedential decision from the Pennsylvania Superior Court cited not for its legal conclusion but as an example of a state prosecution for disorderly conduct involving use of the epithet "n****r."

[12] Plaintiffs also contend that the charge brought against Doe violates two consent decrees in which the Pennsylvania State Police agreed not to charge defendants for having used profane language. The language at issue here is not profane, but more appropriately categorized as hateful.

> *3. Plaintiffs' First Amendment retaliation claim fails, as it cannot be said that Defendants lacked probable cause under "clearly established" law to charge Doe*

"In order to plead a retaliation claim under the First Amendment, a plaintiff must allege: (1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action." *Thomas v. Independent Township*, 463 F.3d 285, 296 (3d Cir. 2006). Furthermore, in the case of an alleged retaliatory prosecution, the plaintiff must allege "an absence of probable cause to support the underlying criminal charge." *Hartman v. Moore*, 547 U.S. 250, 252 (2006).

As explained above, to the extent Doe used racial slurs against the Assailant, Doe was not engaged in constitutionally protected conduct. Even if he were, it cannot be said that the police officer lacked probable cause to charge Doe with disorderly conduct based on the content of the Dean's Report, in which Doe admitted to using racially charged language and four student reported his use of the epithet "n****r." Similar prosecutions have proceeded under Pennsylvania law, and there was hardly a legal consensus that such prosecutions were unlawful.

> *4. Discovery is not required because it would not alter the qualified immunity analysis*

Plaintiffs argue that it is premature for the court to consider and apply the doctrine of qualified immunity at the motion to dismiss stage, stating that it is a question of fact for the jury. The Supreme Court has emphasized, however, that "the 'driving force' behind creation of the qualified immunity doctrine was a desire to ensure that 'insubstantial claims' against government officials [will] be resolved prior to discovery." *Pearson v. Callahan*, 555 U.S. 223, 231-32 (2009) (citing *Anderson v. Creighton*, 483 U.S. 635, 640 n.2 (1987)); *see also Hunter v. Bryant*, 502 U.S. 224, 228 (1991) (noting "[i]mmunity ordinarily should be decided by the court long

before trial"); *Walker v. Coffey*, 905 F.3d 138, 150 (3d Cir. 2018) (motion to dismiss granted on grounds of qualified immunity). At argument, counsel for Plaintiffs acknowledged that Trooper McKeon, who lodged the charges, had the Dean's Report identifying four witnesses who confirmed Doe's use of the epithet in question. When pressed to identify further discovery that would alter the analysis, counsel sought the right to explore the extent and adequacy of Defendant McKeon's investigation. But constitutional violations are not evaluated according to a negligence standard. Thus, absent controlling precedent to the contrary, Defendant McKeon's decision to charge Doe based on the information he had would not be actionable, even if further investigation might have caused the trooper to reconsider bringing charges.

### D. Plaintiffs' state law claims are barred by sovereign immunity

Finally, Plaintiffs' state law claims for malicious prosecution, intentional infliction of emotional distress, and negligence are barred by sovereign immunity. Plaintiffs again cite Justice Kennedy's concurrence in *Albright* in an attempt to overcome sovereign immunity, but their argument is wholly lacking in merit.

There is no question that state troopers performing official duties are protected by sovereign immunity, *La Frankie v. Miklich*, 618 A.2d 1145, 1149 (Pa. Commonw. Ct. 1992), and Plaintiffs plead that the Defendants were acting within the scope of their duties at all relevant times for this action, Am. Compl. ¶ 17. Pennsylvania has enacted a statute reaffirming the immunity of state employees, with certain specified exceptions. The question then is whether any of Plaintiffs' claims fall within the exceptions specified in 42 Pa. C.S. § 8522(b). *Sarin v. Magee*, 333 F. Supp. 3d 475, 481 (E.D. Pa. 2018). They do not, and Defendants have not otherwise consented to being sued. 42 Pa. C.S. § 8521(b). Nor can Plaintiffs rely upon § 1983, because it does not operate to override a state's sovereign immunity. *Quern v. Jordan*, 440 U.S. 332, 342 (1979). Consequently, Plaintiffs' state common law claims are barred.

17

## IV. Conclusion

Having reviewed the video of this incident, I understand how Ms. Boyle, as a mother, finds the decision to charge her son incomprehensible. I also commend her counsel for their zealous and creative advocacy. But as I analyze controlling precedent, the law does not provide the remedy she seeks. Defendants' Motion to Dismiss will therefore be **GRANTED**, and because I cannot discern how the deficits in the Complaint can be cured, the dismissal is with prejudice. An appropriate Order follows.

<u>s/Gerald Austin McHugh</u>
United States District Judge